## Case No. 4,477.

### The EMPRESS.

[Blatchf. Pr. Cas. 175.][1]

District Court, S. D. New York. June 10, 1862.[2]

[1] [Reported by Samuel Blatchford, Esq.]
[2] [Reversed in Case No. 4,478.]

BETTS, District Judge. This vessel and cargo were captured on the 7th of November, 1861, off the mouth of the Mississippi river, in the Gulf of Mexico, by the United States ship-of-war Vincennes, and were sent to the port of New York for adjudication as prize. The libel was filed on the 22d of January, 1862, charging, in general allegations, that the vessel and cargo were lawful prize. Claims were thereafter interposed by separate claimants of the vessel and cargo, all claiming to be neutrals, some British and some Spanish subjects. These claims were accompanied by minute and elaborate averments of various matters wholly irrelevant to the issue of the prize or no prize, and which are altogether irregular, either as pleadings or otherwise, in a prize proceeding. By a decision of the court, on a preliminary motion to strike out all these averments, it was ordered that everything be stricken from the claims except the ordinary averments of ownership, and any special circumstances as to such ownership, if any such existed, and a general denial of the validity of the capture; all else being irrelevant and irregular.[a]

There is no material contrariety in the proofs which develop the facts in the cause, and the arguments of counsel have proceeded upon a common construction of the evidence.

The papers of the vessel show that she is of British build, and was employed by her owners on a voyage to Rio Janeiro, and was at that port chartered by the master to affreighters, partly British and partly Brazilian subjects, for the transportation of a cargo of coffee "to New Orleans or Mobile, as may be ordered by the charterers; and if the vessel, on arrival, be warned off by a blockading squadron, to proceed either to New York, Baltimore, or Philadelphia, which second port of destination is likewise to be named by the charterers previous to the departure of the vessel from Rio de Janeiro." This charter was executed in Rio on the 5th of September, 1861, between Joseph Hopkinson, the master of the vessel, and William

---

[a] [See Case No. 4,476.]

Moore & Co., of Rio, it being then and there known to the parties and publicly notorious that New Orleans and Mobile were under a blockade established by the United States government.

On the 14th of September instructions were given to the master to proceed to New Orleans with his cargo, and, if the port should be open, to deliver the same to the indorsement of the bill of lading made by the charterers; it being added, "Should the port be blockaded, you will be warned off, and will then proceed direct to your discharge port of New York, where indorsed bill of lading also awaits for such contingency."

The vessel sailed from Rio de Janeiro on the 18th of September. A few days after leaving that port the ship spoke a vessel, and received from her the information that all the southern ports continued to be blockaded. Subsequently, and about nine miles off Cape Antonio, which is the westernmost point of the island of Cuba, the ship spoke another vessel from New York, from which the same information was received, together with the latest newspapers. This was but nine or ten days before the capture. The ship pursued her course direct from Rio towards New Orleans, without deviation to any port to make inquiries whether the blockade of New Orleans continued, and on the 26th of November, 1861, struck upon a bar within the mouth of the Mississippi river, and inside of the blockading squadron, in the night-time, and was captured by boats sent from one of the blockading vessels on the following morning. It is contended by the captors that the vessel and cargo should be condemned as lawful prize:

1. Because she left the port of Rio de Janeiro with full knowledge by the master and all parties interested that the port of New Orleans was blockaded, on a voyage direct for that port, without intending to inquire, and without inquiring, at any intermediate point or place, as to the continued existence of said blockade.

2. Because the vessel left the port of Rio de Janeiro upon a voyage to the blockaded port of New Orleans knowing the same to be blockaded, with the unlawful intent to enter said port and deliver her cargo there in violation of said blockade, if an opportunity to do so should occur, and without intending to make any inquiry anywhere as to the continuance of the blockade.

3. Because the vessel, with knowledge of the blockade of the port of New Orleans before the commencement of the voyage, confirmed by information and warning twice received upon the voyage, and once only nine days before the capture, pursued her course with the fraudulent intent to violate said blockade, and actually made the attempt in the night-time, and so far succeeded as to get inside the blockading vessel, where she was captured.

The claimants controvert these several prop-

ositions, and insist that as matter of fact the honest intent was to make inquiry at the blockaded port, without previously attempting to enter, and that as matter of law they had a right to do so. and especially because of the clause in the president's proclamation of April 19, 1861, declaring that "if with a view to violate such blockade a vessel shall approach or shall attempt to leave any of the said ports, she shall be duly warned off by the commander of one of the blockading vessels, who will indorse on her register the fact and date of such warning, and if the same vessel shall again attempt to enter or leave the blockaded port she will be captured," by reason of which they were, as they claim, entitled to enter the blockaded port, unless warned off.

This document or proclamation has been passed by the counsel for all the claimants as a controlling point against the right of capture, and the various particulars gathered from the proofs have been scrutinized minutely on both sides, with eminent ability and learning, in the effort to deduce from the facts evidence tending to show the guilt or the innocence of the transaction.

Before expressing the views of the court upon the effect of the evidence it is proper to dispose of the legal points raised in the case.

First. Was it lawful for the vessel, knowing of the blockade of the port of New Orleans prior to the commencement of the voyage, and with that information repeatedly confirmed upon the voyage, to proceed direct to the mouth of the blockaded port, under pretence of inquiry, or with the actual intent to inquire there, as to the continued existence of the blockade?

The earlier decisions of the prize courts indicated that the act of sailing for a blockaded port, with knowledge of the blockade, was itself evidence of an attempt to evade the blockade; but the state of the law upon that point now is that some overt act denoting the forbidden attempt must be shown, in addition to an intention to commit such infraction, however strongly the latter may have been indicated and persisted in. 1 Phil. Ins. 459, art. 832, and cases cited; The Columbia, 1 C. Rob. Adm. 154; 1 Caines, Cas. 7; Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 198, 200; 1 Kent, Comm. 148, 150. The rule is also so far mitigated in its application that sailing purposely for a blockaded port, with the intention properly notified on the ship's papers, or otherwise fairly disclosed, may be excused in a neutral ship, if the object is honestly to inquire elsewhere whether the blockade is still in continuance; and if so, to avoid the blockaded port, and complete the voyage at a lawful one. The hazard of allowing such privilege, and the necessity of observing the utmost ingenuousness in its indulgence, are emphatically noted in the authorities; and accordingly the courts take heed, in administering it, that the neu-

tral be not permitted, under cover of that relaxation of prize law, to smother the principle by placing himself out of reach of its restraints. An adherence to the old rule would therefore seem to be still exacted in its full simplicity in one of its cardinal features, which is, that the neutral vessel shall make her inquiries so plainly clear of the blockaded port that she shall not acquire the ability (as Chancellor Kent phrases the act) to slip herself into it. Phillimore states the general result of the authorities to be "that it has never, under any circumstances. been held legal that the inquiry shall be made at the mouth of the river or estuary" of the blockaded port. 3 Phillim. Int. Law, 398, § 304. Dr. Lushington says, in the case of The Union, 1 Spinks, Pr. Cas. 164: "The claimants allege the vessel was chartered for Riga, and, being uncertain whether the place was blockaded or not, they sent her to Riga to inquire of the blockading force whether Riga was blockaded." The court inquires, "Is this justifiable?" and remarks, in reply, "under particular circumstances, perhaps it may be justifiable, where information cannot be otherwise procured. to inquire of the blockaded squadron," and denies that the excuse can prevail if a neutral port was accessible, though an inquiry there might be attended with great loss and expense to the neutral ship.

It is clear, therefore, to the court, that the claimants cannot lawfully, under claim of making inquiry whether a port known to have been under blockade when the voyage was set on foot, and after the vessel had been prosecuting it towards the port, is still under blockade, go forward to the entrance of the port, and within the actual line of the blockading force; and that such act, according to the law of nations, subjects the vessel to condemnation as prize of war. The same doctrine was recognized and upheld by this court in its decisions in the cases of The Delta [Case No. 3,777] and The Cheshire [Case No. 2,655], and must continue to be the law of the court until overruled by the appellate tribunals.

The second question is, whether, by the terms of the executive proclamation, a neutral vessel has a right to undertake and pursue a voyage direct to a blockaded port, knowing it to be blockaded, and to enter the port itself, without liability to capture, unless she be previously warned off by a commander of one of the blockading vessels, and the warning be indorsed on the vessel's register.

The paramount fact announced by the executive proclamation of April 19, 1861, is the establishment of the blockade pursuant to the laws of the United States and the law of nations. Now, the law of nations is explicit and indubitable that a neutral vessel, knowing a port to be in a state of blockade, and sailing towards it with intent to evade such blockade, commits a fraud upon the belligerent rights of the blockading power,

and is subject to forfeiture therefor. 3 Phillim. Int. Law, 397; Wheat. Int. Law, 541, 550; 1 Kent, Comm. 148, 149; 1 Duer, Ins. 663, 669; Fland. Mar. Law, 168, 225, note 3; 2 Arn. Ins. 747. It was obviously with this understanding of the character of the blockade proclaimed that the commodore of the Atlantic naval squadron, whose duty it was to direct the naval force in obedience to the executive mandate, in announcing, on the 30th of April, 1861, the effectiveness of the blockade, declares that vessels "passing the capes of Virginia, and coming from a distance, in ignorance of the proclamation, will be warned off," &c. This was precisely the belligerent blockade, under the law of nations. The United States had never insisted that a neutral vessel approaching a blockaded port was entitled to receive notice of a blockade, and to be warned off, unless she approached in ignorance of the blockade. Treaty with England (8 Stat. 125, art. 18); Treaty with France (Id. 184, art. 12). And the supreme court regards these treaty compacts as the true exposition of the law of nations in regard to blockades. Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 199.

The warning and immunity from capture provided by the proclamation of April 19, 1861, must, therefore, be understood to refer to and embrace only those vessels which approach a port in ignorance of its being under blockade. The Columbia, 1 C. Rob. Adm. 154.

The third question is one of fact: Did the vessel, knowing of the blockade of the port of New Orleans before the commencement of the voyage, and with that knowledge confirmed by information and warning twice received during the voyage, and once only nine days before the capture, persistently pursue her course direct to the mouth of the blockaded port with the fraudulent intent to violate the blockade, and did she, in fact, actually attempt to do so?

Neither the testimony of the witnesses taken in praeparatorio, nor the papers found on board, furnish any evidence whatever which tends to show that any ground for a supposition, or any supposition in fact, existed, that the blockade had been or might have been discontinued. On the contrary, all the evidence before the master tended to confirm the notice and knowledge under which his voyage was begun, that the port remained invested. The evidence of the dishonest intent of the vessel in her approach to the passes of the Mississippi is clearly deducible from a great number of circumstances established by the testimony.

It is not designed, nor is it necessary, to enter here upon a review in detail of this evidence. Suffice it to say, that it leaves no doubt whatever upon the mind of the court that the vessel was to go into New Orleans as her real port of destination, and that she continued, till her arrest, to be navigated with that purpose, unless she should be prevented by a warning given to her by the blockading squadron. Every step taken by her on the voyage was an attempt to fulfill that purpose. She avoided calling at Cuba, a neutral island, nearly on the line of her course from Rio to New Orleans, to seek the information she pretended to want. She omitted to lie to off the port to await an opportunity to speak a blockading vessel. She ran directly in for the port in the darkness of the night without making signals or manifesting any expectation of attracting the attention of vessels at all aside of her course of entrance. Had she been honestly in search of information of the state of the markets, or of that of the tide, then it would be unreasonable to suppose she would have run blindly into the shore without taking active measures to be assured of like particulars needful to be known by her, unless she was governed by a desire to keep her movements concealed.

The court can put no other interpretation upon her proceedings than that she meant that the course she was pursuing should take her into the port of New Orleans. This may have been under a mistake of law, in the idea that she might do so excusably if the United States failed to intercept the attempt and turn her away. A misapprehension of the law in that respect can be of no avail to her whilst acting under a clear understanding of the facts.

Upon these several grounds a decree of condemnation is ordered of both vessel and cargo.